IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| DOUGLAS MARIO WINNER, | ) | Case No. 1:19-cv-2348 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | THOMAS M. PARKER |
| | ) | |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | **MEMORANDUM OPINION AND** |
| | ) | **ORDER** |
| Defendant. | ) | |

**I.      Introduction**

Plaintiff, Douglas Mario Winner, seeks judicial review of the final decision of the Commissioner of Social Security, denying his application for disability insurance benefits ("DIB") under Title II of the Social Security Act.  This matter is before me pursuant to 42 U.S.C. § 405(g), and the parties consented to my jurisdiction under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.  ECF Doc. 14.  Because the Administrative Law Judge ("ALJ") applied proper legal standards and reached a decision supported by substantial evidence, the Commissioner's final decision denying Winner's application for DIB must be affirmed.

**II.     Procedural History**

On August 15, 2016, Winner applied for DIB.  (Tr. 15, 69, 140-41).  Winner alleged that he became disabled on February 26, 2016 due to "post traumatic stress disorder, major depressive [disorder] recurrent episodes [with] anxious distress, generalized anxiety disorder, and high blood pressure."  (Tr. 69-70).  The Social Security Administration denied Winner's

application initially and upon reconsideration.  (Tr. 69-95).  Winner requested an administrative

hearing.  (Tr. 111).  ALJ Keith Kearney heard Winner's case on April 11, 2018, and denied the

claim in an October 3, 2018, decision.  (Tr. 12-68).  On August 16, 2019, the Appeals Council

denied further review, rendering the ALJ's decision the final decision of the Commissioner.  (Tr.

1-6).  On October 9, 2019, Winner filed a complaint to obtain judicial review of the

Commissioner's decision.  ECF Doc. 1.

## III.   Evidence

### A.   Personal, Educational, and Vocational Evidence

Winner was born on July 31, 1959, and he was 56 years old ("advanced age") on the

alleged onset date.  (Tr. 140); 20 C.F.R. § 404.1563.  Winner had a Bachelor of Science and

Master of Science in industrial engineering.  (Tr. 42, 53-54, 327, 337).  And the ALJ determined

that Winner was not able to perform any of his past relevant work as an "inspector, tool," which

was rated as medium work.  (Tr. 24).

### B.   Relevant Medical Evidence

#### 1.   Physical

On November 27, 2017, Yaniv Gura, MD, noted that Winner had a disc fusion surgery

for cervical disc herniation and spondylosis in 1995.  (Tr. 481).  Winner told Dr. Gura that his

symptoms were progressively worse over the previous year, including shooting pain, weakness,

numbness, and paresthesias in his neck and right arm.  (Tr. 481).  Winner also said that he had

heart palpitations when he had panic attacks.  (Tr. 482).  On examination, Winner was alert, had

no edema or tenderness, and had decreased sensation over his right forearm.  (Tr. 483).  But he

had 5/5 strength, his muscles were symmetric throughout, and his C3-12 vertebrae were intact.

2

(Tr. 483).  Dr. Gura diagnosed Winner with hypertension and cervical disc herniation and spondylosis after disc fusion.  (Tr. 484).  Dr. Gura referred Winner to a spine clinic.  (Tr. 484).

On November 30, 2017, Winner told Samuel Rosenberg, MD, that he had experienced neck and right arm pain, weakness, numbness, and tingling since April 2017.  (Tr. 490).  Winner reported that he did not drop things due to his pain and weakness, and that he rated the severity of his symptoms as a two on a ten-point scale.  (Tr. 490).  Winner also described his neck pain as "very little."  (Tr. 491).  On examination, Dr. Rosenberg noted that Winner had a normal gait, mild weakness in his fingers, numbness in his fingers, and no pain with shoulder range of motion.  (Tr. 493).  Dr. Rosenberg referred winner for a physical therapy consultation and x-ray. (Tr. 493).  The x-ray of Winner's spine showed disc space narrowing and anterior marginal spurring in the C3-4, C5-6, and C6-7 spaces.  (Tr. 497-98).  Winner had three physical therapy with Gabrielle Fagan, PT, on December 5, 8, and 19, 2017.  (Tr. 499-503, 507-09, 514-16, 521-23).  At intake, Winner told Fagan that his pain was constant, but varied between 2 to 3 out of 10, and that his pain kept him awake at night.  (Tr. 500).  Fagan noted that Winner had limited cervical range of motion, decreased right arm strength, hypertonicity with tenderness to palpation in his right shoulder, and increased radiating symptoms with cervical flexion.  (Tr. 502-03).  On December 5, 2017, Fagan noted that Winner's postural strengthening progressed, and he was able to complete modified exercises without difficulty.  (Tr. 509).  Winner reported 3/10 pain on December 8, 2017 and said that his new exercises worked better for him and were helping.  (Tr. 514).  On December 19, 2017, Winner reported 1/10 pain, 10/10 tingling, and said that his symptoms were getting worse.  (Tr. 521).  Winner said that he had difficulty opening tight jars and buttoning clothes.  (Tr. 521).  Fagan noted that Winner reported occasional dizziness and had decreased right arm strength when compared with his initial evaluation.  (Tr. 523).  At a follow-

3

up on December 26, 2017, Dr. Rosenberg noted that physical therapy made Winner's symptoms worse, diagnosed him with cervical radiculopathy, and prescribed Medrol and Neurontin.  (Tr. 529).  On April 11, 2018, Dr. Rosenberg noted that an MRI showed junctional spondylosis with a posterior disk osteophyte complex in the C4-5 space, mild cord flattening without severe compression, moderate hypertrophic facet arthropathy, mild bilateral foraminal impingement at C5-6, and mild degenerative change without cord compression in the upper thoracic region.  (Tr. 559).  Dr. Rosenberg noted that Winner was not interested in spine blocks and referred him to a spine surgeon.  (Tr. 561).

On June 27, 2018, Ben Roitberg, MD, noted that Winner was referred for treatment of slowly progressive cervical myelopathy.  (Tr. 596).  Dr. Roitberg noted that winner had a gradual decline in upper arm strength, with numbness and pain.  (Tr. 596).  Winner also had a "mild decrease in stability."  (Tr. 596).  On examination, Dr. Roitberg noted that Winner had symmetrical strength, a slightly weak grip, no atrophy in his arms, and a normal gait.  (Tr. 596).  Dr. Roitberg recommended a cervical fusion surgery at C3-4.  (Tr. 596).  On July 2, 2018, Michael Bender, APRN-CNP, evaluated Winner for his scheduled surgery.  (Tr. 590-95).  On examination, Bender noted that Winner had no gross or obvious abnormalities in his extremities, no motor deficits, and grossly intact sensation.  (Tr. 593).  Dr. Roitberg performed the fusion surgery on July 10, 2018.  (Tr. 573, 588-89).  After the surgery, Joseph Hanna, MD, noted that Winner denied any difficulty walking, was ambulatory, had pain in his lower back and right shoulder, had numbness weakness in his hands and arms, and had some weakness in his right leg.  (Tr. 585).  Dr. Hanna noted that Winner was able to wiggle his toes, lift his arms, and squeeze his hands.  (Tr. 585).  On July 11, 2018, Matthew Marcus, PT, noted that Winner had 6/10 pain, passive range of motion within functional limits for basic level of mobility, 5/5

strength and active range of motion, no numbness or tingling in his extremities, and independent gait and sit-to-stand.  (Tr. 576-77).  Pam Mazur, OT, noted that Winner said he would "be okay," ambulated independently, had 6/10 pain, was able to balance within functional limits, and had strength and range of motion within functional limits.  (Tr. 580-81).  Mazur also noted that Winner had normal attention, and his memory, problem solving, and judgment were within functional limits.  (Tr. 581).  Mazur indicated that Winner was functionally appropriate for discharge.  (Tr. 582).  Winner was discharged on July 12, 2018.  (Tr. 573).  At discharge, Winner had good pain control and ability to mobilize.  (Tr. 573).  At his first post-op follow-up, Dr. Roitberg noted that Winner's arm discomfort was better, but he continued to have low level pain and stiffness in his neck.  (Tr. 571).  Dr. Roitberg recommended that Winner limit his physical activity for 6 weeks while he recovered from surgery.  (Tr. 571).

## 2.   Mental

Medical records show that Winner has a history of generalized anxiety disorder (with panic attacks) and major depressive disorder dating back to at least May 2009.  *See* (Tr. 220-21, 227-28, 234-36, 252, 296-301, 306-317).  In May 2009, Kelly Becker, DO, noted that Winner had significant work stress and an history of alcohol/drug abuse.  (Tr. 220).  During 2009, Winner drank 3 to four beers every other night.  (Tr. 234).  He also had traumas including witnessing his father murder his mother, a divorce, being sexually abused by his cousin, and getting bulled in school for being small.  (Tr. 220, 234).  Examinations showed that Winner had 5/5 strength in his upper and lower extremities, good impulse control, fair judgment, logical thought content, intact cognition.  (Tr. 220, 236, 252).  In June 2009, one of Winner's providers noted that he "may miss work" if his depression or anxiety flared up, and he stopped working at some point after that.  (Tr. 227-28, 218).  In August 2009, Jennifer Jackson-Whol, DO, noted

that Winner: (1) did not show any signs of anxiety despite claiming that he had panic attacks; (2) threatened her to fill out FMLA paperwork "because he want[ed] more time off work;" and (3) was noncompliant with or refused treatment.  (Tr. 252).  He returned to work in a limited capacity in April 2010.  (Tr. 218).  In February 2010, Patricia Martin, MD, noted that Winner was "a fairly pleasant man," but he talked excessively and felt helpless.  (Tr. 296, 298-99).  In February 2011, Winner again applied for and was granted FMLA leave due to his mental symptoms.  (Tr. 306-14).  Although he originally had an estimated return date for March 2011, that return date was later extended to April 15, 2011.  (Tr. 313).  And, in May 2011, S. Erfan Ahmed, MD, noted that Winner had a poor ability to function independently, concentrate, maintain attention, deal with work stress, and manage emotions.  (Tr. 317).

On July 28, 2016, Winner saw Shannon Cusack, LISW, for a mental health assessment. (Tr. 326-34).  Winner told Cusack that he had "[a] lot of bad anxiety" and could no longer function.  (Tr 326).  Winner said that his neighbors were "messing" with him, and he could not cope.  (Tr. 326).  He said that he had "lived in constant fear of losing his job" and "was so stressed out" until he lost his job in February 2016, and that he did not feel like he could control his anxiety if he were to return to work.  (Tr. 327).  Winner also told Cusack that he had three children whom he saw "once or twice a month," and that he had a girlfriend until he "blew up after [he] lost [his] job."  (Tr. 327).  Winner identified "bicycling" as one of his strengths and said that his weakness was "being social."  (Tr. 331-32).  Winner also endorsed an inability to cut back on drinking (2 to 3 beers per night), strong urges or cravings to use marijuana ("a couple hits" per night), and spending a "great deal of time" on obtaining, using, or recovering from alcohol and marijuana.  (Tr. 329-30).  On examination, Cusack noted that Winner had depressed mood, loss of interest, decreased appetite, hypersomnia, psychomotor agitation,

6

decreased energy, feelings of worthlessness, difficulty concentrating, suicidal ideation, and excessive anxiety/worry. (Tr. 328). Winner had no noted cognitive impairments, was cooperative, spoke clearly, was well groomed, had an "average" build, and had "fair" judgment/insight. (Tr. 332). Cusack diagnosed Winner with major depressive disorder with anxious distress and PTSD, and she referred him for behavioral counseling, therapy, and medication services. (Tr. 333). Cusack also noted that Winner met criteria for mild alcohol use disorder and mild cannabis use disorder, but he declined treatment for those conditions because "he want[ed] to focus on his mental health." (Tr. 333).

Between August 3 and October 6, 2016, Winner had eleven therapy sessions with Sara Syed, CPST. (Tr. 425-33). On August 3, 2016, Syed noted that Winner "was under severe stress, anxiety and panic." (Tr. 425). On August 15, 2016, Syed noted that she and Winner were able to "engage[] in active conversation." (Tr. 428). Winner also had counseling sessions with therapist Brittany Roppel on September 7, November 17, November 30, and December 22, 2016. (Tr. 416-17, 425). On September 7, 2016, Roppel noted that Winner said that he enjoyed walking his dog and watching television, and that he wanted to learn healthy ways to cope with depression and anxiety. (Tr. 425). On November 17 and 30, 2016, Winner told Roppel that he was stressed and frustrated living with his family because his family got into arguments, his son yelled and screamed, and children lived there. (Tr. 416-17). Winner also said that his panic attacks made him feel light-headed and dizzy, and that he wanted to live in Florida with his friends. (Tr. 416-17).

On September 8, 2016, Winner told Lindsey Kershaw, CNP, that his anxiety and panic were "out of control" for the previous 6 months. (Tr. 344). Winner told Kershaw that medications had not helped his anxiety, panic, excessive thoughts, and anger over the previous

two years.  (Tr. 344).  Winner also said that he was unable to get along with people, and he had disagreements and legal issues with his neighbors.  (Tr. 344-45).  He had difficulty sleeping, woke up with racing thoughts, and napped two to three times per day.  (Tr. 345).  He also said he was "very depressed", had a poor appetite, and had a hard time getting outside.  (Tr. 345).  At follow-ups on October 6, November 17, and December 22, 2016, Winner reported that his condition had remained generally the same.  (Tr. 344-49, 403-07, 409-13).  Specifically, Winner said that he continued having sleeping difficulty, took up to two naps per day, had poor energy, and used marijuana and alcohol daily.  (Tr. 344, 403-04, 409-10).  On October 6, Winner said that he had memory problems.  (Tr. 344).  Winner said that he was constantly worried, could not concentrate, anxious, and became forgetful and tired due to his worrying.  (Tr. 403-04).  Winner also indicated that he had moved into his ex-wife's and son's house, that he took a trip to Florida with his friends, and that he enjoyed spending time in Florida.  (Tr. 403-04).  Winner noted that, while he was in Florida, he had intermittent cramping from his cervical spine fusion, which ibuprofen helped.  (Tr. 404).  On December 22, Winner noted that he had chest discomfort, sweating, and weakness, but he did not seek medical care and it went away.  (Tr. 409).  He also said that he had stopped using marijuana.  (Tr. 410).  On examination, Kershaw noted that Winner had normal language, normal attention/concentration, appropriate fund of knowledge, cooperative behavior, fluent speech, intact memory, appropriate affect, depressed and anxious mood, and fair judgment/insight.  (Tr. 347, 405-06, 411-12).  During this time Kershaw continued to prescribe medication to treat his mental symptoms, and she directed Winner to follow up with his therapist.  (Tr. 349, 407, 413).  On December 22, Winner noted that his medication had "taken off the edge, but [did] not stop him from worrying."  (Tr. 410).

8

On November 8, 2017, Winner had a therapy session at Manatee County Rural Health Services, Inc., in Florida.  (Tr. 460).  Winner told his therapist that he had "symptoms of panic, being heart palpitations, heaviness in his chest, shaking hands, excessive worry, excessive sweating, nausea, and problems sleeping."  (Tr. 460).  Winner told his therapist that he usually lived in Ohio, but he resided in Florida during the winter months and planned to live there for "5 to 6 months" after the holidays.  (Tr. 460).  On examination, Winner had appropriate affect, dysthymic mood, logical thought processes, good insight/judgment, and active participation. (Tr. 460).

On November 8, 2017, Bryson Blackburn, MSW, noted that Winner had constant, excessive worry, which was influenced by his major life stressors, relationship stress, and alcohol use.  (Tr. 444).  Winner said that he had a depressed mood, irritability, anhedonia, a lack of motivation, family and financial stress, frustration, sad mood, lethargy, anhedonia, no goal-directed behavior, agitation, anxiety, history of panic attacks, and intrusive thoughts.  (Tr. 444). Blackburn noted that Winner did not exhibit any pain behaviors.  (Tr. 444).  On examination, Blackburn noted that Winer was well-groomed, cooperative, calm, pleasant, focused, and not easily distracted.  (Tr. 445).  He had a normal attention span, fluent speech, appropriate gait and stance, intact memory, no cognitive issues, anxious and flat affect, intact thought processes, obsessive thinking and anger about his past, and intact judgment/insight.  (Tr. 445).  Blackburn diagnosed Winner with panic disorder, generalized anxiety disorder, moderate recurrent major depression, and personality disorder.  (Tr. 445).  At a follow-up on November 15, 2017, Winner's complaints and condition on examination remained generally the same.  (Tr. 441-42, 548-52).  Blackburn also noted that Winner discussed reading, doing puzzles, and using deep breathing exercises to control his symptoms, but they did not help.  (Tr. 442).  At a follow-up on

January 4, 2018, Winner told Blackburn that he could not stop thinking about people taking advantage of him, which made him anxious and panicked. (Tr. 545). Winner said that he had a lack of motivation, inability to make decisions, and decreased effectiveness/productivity. (Tr. 544). He also noted that he had noticed an onset of liver problems, and that cold weather in Ohio made his joints, back, and neck hurt. (Tr. 545). On examination, Winner had a normal attention span, fluent speech, appropriate gait and stance, intact memory, no cognitive issues, anxious and flat affect, intact thought processes, obsessive thinking and anger about his past, and intact judgment/insight. (Tr. 545).

On November 30, 2017, Winner told Jeffrey Riskin, LISW, that he had had two short panic attacks since his previous therapy session. (Tr. 474). Winner told Riskin that he had difficulty living in Florida and complained that management at a facility where he stayed had shut down a recreation building. (Tr. 474). On examination, Riskin noted that Winner was in "mild" distress, and his affect/behavior were appropriate. (Tr. 474). Winner had intact memory, intact thought process, focused concentration, coherent thought content, congruent mood, no problems with motor behavior or speech, and intact judgment/insight. (Tr. 477-78). Riskin recommended that Winner continue with therapy as needed. (Tr. 478).

On January 2, 2018, Winner told Donna Dillon, ARNP, that he had no difficulty concentrating, remembering, making decisions, or doing errands alone. (Tr. 547). He said that he exercised regularly at a moderate level. (Tr. 547-48). And he said that he was stressed, but he took his medications as directed and felt like his symptoms were controlled. (Tr. 547-48). On examination, Dillon noted that Winner had cooperative and pleasant behavior, short attention span, fluent speech, intact motor activity, appropriate gait and stance, intact memory, euthymic mood, congruent affect, unremarkable thought content, goal-directed and logical thought

processes, and intact insight/judgment.  (Tr. 548).  Dillon continued Winner's medications.
(Tr. 549).

### C.      Relevant Opinion Evidence

#### 1.      Treating Therapist – Jeffrey Riskin, LISW

On March 7, 2018, Riskin completed a "physical medical source statement" and "mental
impairment questionnaire."  (Tr. 533-38).  Riskin noted that he saw Winner with "varying
frequency" between July 2009 and July 2011, and that he had seen him for "3 visits" between
July 2016 and completing the opinion form.  (Tr. 533).  Riskin noted that Winner's symptoms
included panic, depressed mood, dysphoria, poor distress tolerance, and poor mood regulation.
(Tr. 533).  Riskin noted that Winner was drawn to and triggered by conflict, and that he had
nearly constant emotional pain.  (Tr. 533).  Riskin indicated that Winner's reported side effects
outweighed any positive response that he had from medication, and that his impairments would
last at least 12 months.  (Tr. 533).  Riskin indicated that Winner's depression, anxiety, and
personality disorder affected his physical condition, and that he would need to take two to three
unscheduled breaks per day due to anxiety and panic.  (Tr. 534).  Riskin indicated that Winner
would not need to elevate his leg or use assistive devices when walking.  (Tr. 534-35).  Riskin
said that Winner would be off-task for 20% of the day, was capable of low-stress work, would
have "good days" and "bad days," and he would be absent from work four days per month.
(Tr. 536, 538).

On the mental function form, Riskin noted that Winner had "limited but satisfactory"
ability to: carry out very short and simple instructions; perform activities within a schedule; and
understand and remember short or detailed instructions.  (Tr. 537-38).  Winner was "seriously
limited, but not precluded," in his ability to: maintain attention and concentration for extended

periods; manage regular attendance and be punctual within customary tolerances; sustain an ordinary routine without special supervision; perform at a consistent pace without an unreasonable number and length of rest periods; remember locations and work-like procedures; ask simple questions or request assistance; and set realistic goals or make plans independently. (Tr. 537-58).  Winner was "unable to meet competitive standards" in his ability to: carry out detailed instructions, work in coordination with or proximity to others without being distracted; complete a normal workday and workweek without interruptions from psychologically based symptoms; interact appropriately with the general public; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; and respond appropriately to changes in the work setting.  (Tr. 537-38).  Winner had "no useful ability to function" in his ability to: accept instructions; respond appropriately to criticism from supervisors; and get along with coworkers or peers without distracting them or exhibiting behavioral extremes.  (Tr. 537-38).

### 2.      Examining Psychologist – Thomas Evans, Ph.D.

On October 26, 2016, Thomas Evans, Ph.D., examined Winner and evaluated his psychological function on referral from Opportunities for Ohioans Division of Determination. (Tr. 336-40).  Dr. Evans noted that Winner was cooperative and friendly throughout the entire evaluation.  (Tr. 336).  Winner denied abusing alcohol but said that he drank up to two beers before bed and used marijuana twice a week for his anxiety.  (Tr. 337).  Winner told Dr. Evans that he got along poorly with his former coworkers and other people because he was easily agitated, argued a lot, and was "very defensive."  (Tr. 337).  At his last job, Winner said he was loud, confronted his bosses, and had a problem being told what to do.  (Tr. 337).  Winner also said that police went to his house 15 or 20 times in the previous month due to disturbances with his neighbors.  (Tr. 337).  Winner said that he had a depressed mood, fatigue, no motivation,

12

daily crying episodes, and frequent irritability.  (Tr. 338).  Winner said that he had no typical

daily routine, but he cooked, cleaned, did laundry, and grocery shopped.  (Tr. 338).  Winner said

that he napped "all the time," slept two to three hours at night, and had a poor appetite.

(Tr. 338).  Winner said that he was anxious "all day long," and that his symptoms increased

when he was in public.  (Tr. 338).  On examination, Dr. Evans noted that Winner had no

conversation or thought problems and made good eye contact.  (Tr. 338).  He had no observed

anxiety features.  (Tr. 338).  He was oriented, was able to recall two of three words after a five-

minute delay and was able to recite six digits forward and four digits backward.  (Tr. 339).

Dr. Evans determined that Winner met criteria for alcohol misuse disorder, unspecified cannabis

use disorder, generalized anxiety disorder, and intermittent explosive disorder.  (Tr. 339).

Based on his interview and examination, Dr. Evans opined that Winner had average

cognitive abilities and would not have any difficulty understanding and carrying out simple to

moderately complex instructions.  (Tr. 339).  Winner had good attention and concentration, and

he was able to maintain focus without difficulties.  (Tr. 339).  Dr. Evans noted that Winner was

easily overwhelmed and frequently lashed out with anger, causing issues with his work, authority

figures, his neighbors, and police.  (Tr. 340).

### 3. State Agency Consultants

On October 5, 2016, state agency consultant James Cacchillo, DO, opined that Winner

had no severe physical impairments.  (Tr. 73).  On December 22, 2016, Maureen Gallagher, DO,

concurred with Dr. Cacchillo's opinion.  (Tr. 87).

On November 15, 2016, state agency psychological consultant Patricia Kerwin, Ph.D.,

evaluated Winner's mental capacity based on a review of Winner's medical records.  (Tr. 74-77).

Dr. Kerwin determined that Winner had mild restriction in his daily living activities, moderate

difficulties in maintain social functioning, and moderate difficulties maintaining concentration, persistence, and pace.  (Tr. 74).  Dr. Kerwin indicated that Winner had no limitations in understanding and memory.  (Tr. 76).  He was moderately limited in his ability to work in coordination with or proximity to others without being distracted by them but was "capable of working without frequent coordination with others."  (Tr. 76-77).  Winner was moderately limited in his ability to interact appropriately with the general public, accept instructions, respond appropriately to supervisor criticism, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and respond appropriately to changes in the work setting.  (Tr. 77).  Dr. Kerwin indicated that Winner would work best independently and without close over-the-shoulder supervision.  (Tr. 77).  He could not resolve conflicts or persuade others to follow demands.  (Tr. 77).  On December 20, 2016, Judith Schwartzman, Psy.D., concurred with Dr. Kerwin's opinion, but added that Winner was moderately limited in his ability to complete a normal workday and workweek without interruptions from his psychologically based symptoms and perform at a constant pace without an unreasonable number and length of rest periods.  (Tr. 90).  Dr. Schwartzman explained that Winner would need flexibility in his work schedule, brakes, and pacing when his symptoms increased.  (Tr. 90).  Dr. Schwartzman also noted that Winner:

> Appears capable of brief and superficial interactions with general public, supervisors, and co-workers.  Would do best in worksites in which he could work relatively independently and without close over-the-shoulder supervision.  No resolving conflicts or persuading others to follow demands.  Supervisors will need to offer constructive criticism.

(Tr. 91).

14

### D.      Relevant Testimonial Evidence

Winner testified at the ALJ hearing.  (Tr. 40-58).  Winner said that he dropped "jars and everything" around his house.  (Tr. 48).  Winner said he took daily naps, which lasted up to two hours each, and that he felt like he could not do anything.  (Tr. 50).  Winner said that when he was working, his panic and anxiety were worse due to work pressure.  (Tr. 51).  When he got home every night, he sat in front of the television and thought "about things over and over and over again."  (Tr. 51, 57).  Winner said that he lived with his son and two grandchildren, but his son was loud and had a temper.  (Tr. 54).  Winner lived in a trailer in Florida by himself in November and December because cold weather bothered him, and he had supportive friends who lived there.  (Tr. 55, 57).  Winner's hobbies included reading and bicycling, but he said he wasn't able to do that anymore.  (Tr. 56).  He said he drank "one or two" beers "once or twice a week," and that he "used to smoke" marijuana because he "thought it would help with [his] anxiety and panic."  (Tr. 57).  He said he stopped smoking marijuana at the end of the previous year when his lawyer advised him to.  (Tr. 57).

Winner said that he often had soreness in his neck, especially after lifting a lot.  (Tr. 47).  He said that he often went home in pain after work, and eventually had surgery in 1995.  (Tr. 47).  Winner said that his pain was progressively worse and got to the point where he had problems opening jars a year before the hearing.  (Tr. 47, 50).  He also had tingling, numbness, and weakness in his arm.  (Tr. 48).  He had trouble sleeping and would wake up with his arms numb.  (Tr. 48).  Winner said that he usually used his left arm instead of his right arm because the repetitive motion on his right side caused "a lot of problems."  (Tr. 49).  Winner also said that his anxiety and panic caused him to feel light-headed and dizzy on a daily basis.  (Tr. 50).  He would also stumble, got disoriented, and was forgetful.  (Tr. 51).  Winner testified that he had

problems with his neighbors and the police in the past, and that his "family[ has] never been good." (Tr. 53). Winner said that he took antidepressant medication, heart medicine, and gabapentin for his neck. (Tr. 56). His medications "dull[ed him] out." (Tr. 56).

Winner testified that he last worked as a quality manager at Dove Die and Stamping Company, beginning in 2014. (Tr. 41). Winner said his job involved doing paperwork for submitting parts, and he had to lift and inspect parts that weighed between 20 and 40 pounds on average. (Tr. 41). He sometimes lifted up to 50 pounds. (Tr. 42). He also said that he had to program a part-measuring machine and it took him "[m]any, many years" to learn the job. (Tr. 42). Winner testified that his job was intense because he had "to get everyone to do what they were supposed to be doing. Quality is not a one person job." (Tr. 52). Winner said that he stopped working because he had panic and anxiety attacks, told the owner that he was light-headed, and was told to go home and collect unemployment. (Tr. 43, 52). Winner had also worked at five other companies as a quality engineer and inspector, lifted between 40 and 50 pounds at those jobs, and was let go after he had conflicts with his coworkers or owners. (Tr. 44-46). Winner said that he tried applying to new jobs for six months after his last job ended but was unable to get one due to his panic and anxiety. (Tr. 43). He stated that he had also taken short-term disability twice. (Tr. 51).

Mary Eberts, a vocational expert ("VE"), also testified at the hearing. (Tr. 58-66). The VE testified that Winner's previous work all fell under the category "inspector, tools," which was described as and performed as medium work. (Tr. 59). None of Winner's prior job skills were transferrable to unskilled labor. (Tr. 62). The ALJ asked the VE whether a hypothetical individual with Winner's pervious work, education, and age could perform any jobs in the national economy if he was limited to medium work, and:

> The hypothetical would be limited, in so far as they would be limited to
> occasional interaction with small group of coworkers, where that contact would
> be casual in nature.  The hypothetical individual would be limited to occasional
> superficial interaction with the public.  By superficial, I mean if a member of the
> public were to approach and inquire as to the nearest restroom, they'd be able to
> provide that information, but that would be the extent of the interacting that they
> would do.  The hypothetical individual would be limited to simple tasks, limited
> routine and repetitive tasks.  The hypothetical individual would be limited to a
> static work environment, and by static, I mean they would be able to tolerate few
> changes in the routine work setting.  However, when said changes did take place,
> they need to take place gradually, and would occur infrequently.  The hypothetical
> individual would be limited to frequent reaching overhead and would be limited
> to frequent handling and fingering.

(Tr. 59-60).  The VE testified that such an individual could not perform Winner's past work, but

he could work as a janitor, packer, or store laborer.  (Tr. 61).  The ALJ asked if work would still

be available if the hypothetical individual were additionally limited to "frequent rotation, flexion,

and extension of the neck."  (Tr. 62).  The VE testified that the same jobs would be available.

(Tr. 62).  The  ALJ also asked if work would be available if the hypothetical individual were off

task 20% of the workday, and the VE said that employers would not tolerate that in her

experience.  (Tr. 62).

On examination by Winner's attorney, the VE testified that employers would not tolerate

four absences per month.  (Tr. 63).  The VE said it would be a problem if a hypothetical

individual occasionally needed "flexibility in the work schedule, taking breaks and pacing."

(Tr. 63).  The VE testified that employers typically permitted two 15-minute breaks and a 30-

minute break at scheduled times.  (Tr. 64).  The ALJ also asked if there would be a problem if,

after any probationary period, the hypothetical individual would need constructive criticism from

supervisors.  (Tr. 64-65).  The VE testified that any need for more than occasional supervisor

redirection or instruction after the probationary or training period would preclude competitive

employment.  (Tr. 65).  The VE also said it would be "problematic" if an individual could not

interact occasionally with coworkers.  (Tr. 65).

## IV.  The ALJ's Decision

The ALJ's October 3, 2018, decision found that Winner was not disabled and denied his

claim for DIB.  (Tr. 15-26).  The ALJ found that Winner had the severe impairments of

"depression, anxiety, posttraumatic stress disorder, congenital fusion at C4-5 with prominent

junctional spondylosis at C3-4 and to slightly less degree at C5-6 with mild cord flattening at

C3-4 without severe compression."  (Tr. 18).  The ALJ determined that none of Winner's

impairments, singly or in combination, met or medically equaled a listed impairment under 20

C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 18).  The ALJ found that Winner had the RFC to

perform a range of medium work, except that:

> he is limited to occasional interaction with a small group of coworkers where the
> contact is casual in nature.  He is limited to occasional superficial interaction with
> the public.  He is limited to simple, routine, and repetitive tasks.  The claimant is
> limited to a static work environment, tolerating few changes in a routine work
> setting and when said changes do occur, they would need to take place gradually
> and would occur infrequently.  He could perform free reaching overhead and
> frequent handling and fingering.

(Tr. 20).

In evaluating Winner's RFC, the ALJ expressly stated that he "considered all symptoms"

in light of the medical and other evidence.  (Tr. 20).  The ALJ specifically discussed Winner's

reports that his mental health symptoms precluded him from maintaining normal and health

relationships, that his symptoms caused conflict at work, that he had panic attacks and anxiety

that caused him to feel light-headed and dizzy, and that his vision became distorted due to stress.

(Tr. 20).  The ALJ considered Winner's testimony that he dropped things due to weakness and

numbness, called of work due to racing thoughts and panic attacks, and became loud and

uncontrollable during conflicts with neighbors and the police.  (Tr. 20-21).  But the ALJ determined that Winner's subjective complaints "about the intensity, persistence, and limiting effects of his . . . symptoms [were] inconsistent" with evidence that his functioning was better. (Tr. 21).  Further, the ALJ noted that Winner had used alcohol and marijuana extensively during the relevant period.  (Tr. 21).

The ALJ also exhaustively reviewed the medical evidence in the record.  (Tr. 21-24). The ALJ specifically noted that Winner told his providers that he had frequent conflicts with police, neighbors, coworkers, and managers.  (Tr. 21).  He noted that Winner reported that he did not have a support system, but saw his son occasionally, saw his other children once or twice a month, and was stressed after he moved in with his ex-wife and son in 2016.  (Tr. 21-22).  The ALJ also noted that Winner reported using alcohol and marijuana a few times a week.  (Tr. 21). The ALJ mentioned that Winner told Riskin that he stayed in his trailer in Florida but had two panic attacks while he was living there.  (Tr. 22).  Further, the ALJ noted that Winner reported worsening neck pain, weakness, and numbness to Dr. Gura in November 2017, that ex-rays showed prominent junctional spondylosis and mild cord flattening, and that he eventually underwent a spinal fusion in July 2018.  (Tr. 22).  The ALJ noted that Winner reported having "good pain control" and "could mobilize easily" after his surgery.  (Tr. 22).

The ALJ noted that he gave "little weight" to Dr. Cacchillo's and Dr. Gallagher's opinion because later evidence showed spondylosis and mild cord flattening in Winner's spine, requiring surgery.  (Tr. 22).  The ALJ said that he gave Dr. Evans's opinion "partial weight . . . to the extent that it was consistent with the above residual functional capacity findings," but that the opinion was "rather vague and did not specify the degree of mental limitations."  (Tr. 22).  The ALJ explained that he gave "partial weight" to Dr. Kerwin's and Dr. Schwartzman's opinions

19

because evidence showed that Winner was slightly less limited than the opinions stated.  (Tr. 23).
Specifically, the ALJ stated that treatment notes showed that Winner could spell "world"
forwards and backwards, was not in any physical distress, did not sleep well, could recall two of
three words after five minutes, and could recite six digits forwards and backwards.  (Tr. 23).

The ALJ noted that Riskin had completed an "undated physical questionnaire," and
another mental status questionnaire on March 7, 2018.  (Tr. 23).  The ALJ stated that he gave
"little weight" to Riskin's opinions because:

> First, the questionnaire with regard to the claimant's physical limitations is
> outside Mr. R[i]skin's area of expertise.  With regard to the claimant's mental
> limitations, Mr. R[i]skin's opinion does not take into account the frequency of the
> claimant's alcohol and marijuana use, despite his reports of use throughout the
> record.  Further, this opinion is contradicted to the examination findings at the
> psychological consultative examination.  Examination findings showed he was
> slightly unkempt and unshaven.  He did not appear to be in any physical distress.
> He said that he did not sleep well.  He could spell the word "WORLD" forwards
> and backwards.  He could recall two out of three words after a five-minute delay.
> He could recite six digits forwards and four digits backwards.  The claimant also
> testified that he lived independently in Florida from November through March for
> the last few years.

(Tr. 24).

Because Winer lacked the ability to perform all or substantially all of the requirements of
work at the medium exertional level, the ALJ relied on testimony from a VE to determine
whether Winner would be able to perform any work in the national economy.  (Tr. 25-26).
Based on the VE's testimony, the ALJ found that someone with Winner's age, experience, and
RFC could "perform the requirements of representative occupations such as: janitor; packer; and
store/laborer."  (Tr. 25) (citations omitted).  In light of his findings, the ALJ determined that
Winner was not disabled from February 26, 2016, through the date of his decision and denied the
claim for DIB.  (Tr. 26).

V.     **Law & Analysis**

A.     **Standard of Review**

The court reviews the Commissioner's final decision to determine whether it was supported by substantial evidence and whether proper legal standards were applied.  42 U.S.C. § 405(g); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).  Substantial evidence is any relevant evidence, greater than a scintilla, that a reasonable person would accept as adequate to support a conclusion.  *Rogers*, 486 F.3d at 241; *Biestek v. Comm'r of Soc. Sec.*, 880 F.3d 778, 783 (6th Cir. 2017) ("Substantial evidence supports a decision if 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion' backs it up." (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971))).

Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence.  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003).  If supported by substantial evidence and reasonably drawn from the record, the Commissioner's factual findings are conclusive – even if this court might reach a different conclusion upon fresh review or if the evidence could have supported a different conclusion.  42 U.S.C. § 405(g); *see also Rogers*, 486 F.3d at 241 ("[I]t is not necessary that this court agree with the Commissioner's finding, as long as it is substantially supported in the record."); *Biestek*, 880 F.3d at 783 ("It is not our role to try the case *de novo*." (quotation omitted)).  This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without being second-guessed by a court. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless.  *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision

. . . will not be upheld [when] the SSA fails to follow its own regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review decisions of administrative agencies for harmless error.").  Furthermore, the court will not uphold a decision, when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting Sarchet v. Charter, 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-CV-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue*, No. 2:10 CV 017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-CV-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010).  Requiring an accurate and logical bridge ensures that a claimant, as well as a reviewing court, will understand the ALJ's reasoning.

The Social Security regulations outline a five-step process the ALJ must use to determine whether a claimant is entitled to benefits: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of her RFC; and (5) if not, whether, based on the claimant's age, education, and work experience, she can perform other work found in the national economy.  20 C.F.R. § 404.1520(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006).  Although it is the Commissioner's obligation to produce evidence

at Step Five, the claimant bears the ultimate burden to produce sufficient evidence to prove that he is disabled and, thus, entitled to benefits.  20 C.F.R. § 404.1512(a).

### B.    Mental Function Opinions and Mental RFC

Winner argues that the ALJ erred by failing to provide adequate explanation for not incorporating into the RFC certain limitations – namely, in his need for constructive supervisor criticism, his ability to interact more than superficially with co-workers and supervisors, and his need for a flexible work schedule and pace during symptom flare-ups – from the state agency consultants' and Riskin's opinions.  ECF Doc. 15 at 14-22.  Winner asserts that, when explaining why he gave only "partial weight" to the state agency consultants' opinions, the ALJ did not provide explanations related to supervisor and co-worker interaction or the need for pace/time-on-task adjustments.  ECF Doc. 15 at 14-15.  Likewise, Winner argues that the ALJ's reasons for rejecting Riskin's opinion – that he was not an acceptable medical source, opined on physical limitations outside his area of expertise, did not take into account Winner's alcohol and marijuana use, and gave limitations inconsistent with examination findings – were not "good reasons" because Riskin was the only provider who had an extensive relationship with Winner, his opinion was consistent with other mental function opinions, he did not opine on physical limitations, and the ALJ did not explain why failure to consider alcohol and drug use made the opinion less probative.  ECF Doc. 15 at 19-21.  Further, Winner contends that the ALJ's failure to provide adequate explanation for not including those limitations was not harmless error because: (1) substantial evidence in the record supported those limitations; and (2) including those limitations would have resulted in a finding that he was not able to perform work in the national economy.  ECF Doc. 15 at 15-17.

The Commissioner responds that the ALJ applied proper legal standards and reached a decision supported by substantial evidence in weighing the mental function opinions and assessing Winner's mental RFC.  ECF Doc. 17 at 10-14.  The Commissioner argues that the ALJ reasonably explained that: (1) he gave "partial weight" to Dr. Evans' opinion by crediting limitations that were consistent with other evidence, including Winner's successful cognitive functioning tests; (2) he gave the state agency consultants' opinions "partial weight" because the evidence showed that Winner was less limited in interaction than the consultants opined, and Dr. Kerwin's omission of a schedule flexibility and constructive criticism limitation supported discounting that portion of Dr. Schwartzman's opinion; and (3) Riskin's status as a non-acceptable medical source and failure to consider Winner's drug and alcohol use made his opinion less reliable.  ECF Doc. 17 at 10-13.  Further, the Commissioner asserts that the ALJ properly addressed the fact that Riskin completed his opinion on a "physical medical source statement" form by stating that Riskin was not qualified to give a physical limitations assessment.  ECF Doc. 17 at 13.  Moreover, the Commissioner contends that substantial evidence supported the ALJ's ultimate mental RFC assessment, including evidence that Winner had competed a master's degree in science and industrial engineering, he could live in Florida alone during the winters, he successfully completed several cognitive-functioning tests, and he had sustained relationships with his children.  ECF Doc. 17 at 10.

At Step Four of the sequential analysis, the ALJ must determine a claimant's RFC by considering all relevant medical and other evidence.  20 C.F.R. § 404.1520(e).  The RFC is an assessment of a claimant's ability to do work despite his impairments.  *Walton v. Astrue*, 773 F. Supp. 2d 742, 747 (N.D. Ohio 2011) (citing 20 C.F.R. § 404.1545(a)(1) and SSR 96-8p, 1996 SSR LEXIS 5 (July 2, 1996)).  "In assessing RFC, the [ALJ] must consider limitations and

restrictions imposed by all of an individual's impairments, even those that are not 'severe.'"

SSR 96-8p, 1996 SSR LEXIS 5.  Relevant evidence includes a claimant's medical history,

medical signs, laboratory findings, and statements about how the symptoms affect the claimant.

20 C.F.R. § 404.1529(a); *see also* SSR 96-8p, 1996 SSR LEXIS 5.

In considering all the evidence at Step Four, the ALJ is required to weigh every medical

opinion in the record.  20 C.F.R. § 404.1527(c).  Unlike opinions from treating medical sources,

an ALJ is not required to provide "good reasons" for discounting an opinion from a nontreating

or nonexamining source.  *See Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir.

2013) (An ALJ must give "controlling weight" to a treating physician's opinion unless he

provides "good reasons" for discounting it, but "nontreating and nonexamining sources are never

assessed for 'controlling weight.'"); *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir.

2007) (An ALJ does not need to provide "good reasons" for rejecting the opinion.).  Instead, an

ALJ must weigh such opinions based on: (1) the examining relationship; (2) the degree to which

supporting explanations consider pertinent evidence; (3) the opinion's consistency with the

record as a whole; (4) the physician's specialization related to the medical issues discussed; and

(5) any other factors that tend to support or contradict the medical opinion.  *Gayheart*, 710 F.3d

at 376; 20 C.F.R. § 404.1527(c).

Likewise, the ALJ need not give special deference to an opinion from source that is not

an "acceptable medical source" or provide "good reasons" for discounting it.  *See* 20 C.F.R.

§ 404.1513(a)(2) (2016) (defining "acceptable medical source," for claims filed before March

27, 2017, as licensed physicians, psychologists, optometrists, podiatrists, and speech-language

pathologists); *Hill v. Comm'r of Soc. Sec.*, 560 F. App'x 547, 550 (6th Cir. 2014) (unpublished);

*Pruitt v. Comm'r of Soc. Sec.*, No. 1:16-cv-2927, 2018 U.S. Dist. LEXIS 49512 *44 (N.D. Ohio

2018).  Nevertheless, the ALJ should consider the opinion "along with the other relevant evidence in the file," taking into account: (1) how long the source has known and how frequently the source has seen the individual; (2) how consistent the opinion is with other evidence; (3) the degree to which the source presents relevant evidence to support an opinion; (4) whether the source has a specialty or area of expertise related to the individual's impairment(s); and (5) any other factors that tend to support or refute the opinion.  *See* SSR 06-3p, 2006 SSR LEXIS 5 (Jan. 1 2006) (noting that licensed clinical social workers, *inter alia*, have increasingly assumed a greater percentage of treatment and evaluation functions).[1]  And the ALJ "should generally explain the weight given to opinions from these "other sources," or otherwise ensure that the discussion of the evidence . . . allows a claimant or subsequent review to follow the adjudicator's reasoning."  SSR 06-3p, 2006 SSR LEXIS 5.

### 1.	Weighing the Mental Function Opinion Evidence

The ALJ applied proper legal standards and reached a conclusion supported by substantial evidence in evaluating the mental function opinions in the record.  42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241.  The ALJ was also not required to give "good reasons" for discounting their opinions or give the opinions any special deference because Dr. Kerwin and Dr. Schwartzman were not treating physicians, and Riskin (a social worker) was not an "acceptable medical source."  *Gayheart*, 710 F.3d at 376; *Hill*, 560 F. App'x at 550; *Pruitt*, 2018 U.S. Dist. LEXIS 49512, at *44; 20 C.F.R. § 404.1513(a)(2).  Nevertheless, the ALJ adequately explained that: (1) he gave "partial weight" to Dr. Kerwin's and Dr. Schwartzman's opinions because evidence in the record showed that Winner was slightly less limited than the opinions

---

[1] The Commissioner rescinded SSR 06-3p for claims filed on or after March 27, 2017.  *Rescission of Social Security Rulings 96-2p, 96-5p, and 06-3p*, 82 Fed. Reg. 15263 (Mar. 27, 2017).  Because Winner filed his claim on August 15, 2016, SSR 06-3p applies in this case.

stated; and (2) he gave "little weight" to Riskin's opinions because any physical functional assessments were outside of Riskin's area of expertise, he did not take Winner's drug/alcohol use into account in assessing his mental function, and the mental limitations were contradicted by the consultative examination findings.  (Tr. 23-24).

Moreover, Winner's argument – that the ALJ erred by not specifically discussing why he did not incorporate from those opinions limitations that Winner have only superficial interaction with coworkers, receive constructive criticism from supervisors, and be given a flexible schedule and pace requirements during symptom flare-ups – is unavailing.  First, it is important to note that the ALJ's decision to limit Winner to occasional, and not superficial, coordination with coworkers was not inconsistent with Dr. Kerwin's and Dr. Schwartzman's opinions.  (Tr. 20). Instead, the decision was *consistent* with Dr. Kerwin's and Dr. Schwartzman's opinions findings that Winner had only "moderate" limitations in this area and was precluded only from "frequent coordination with others."[2]  (Tr. 74, 76-77, 90-91).  Second, the ALJ was not required to provide a limitation-by-limitation discussion of Dr. Kerwin's, Dr. Schwartzman's, and Riskin's opinions. *Cf. Babineau v. Astrue*, No. 09-1363, 2010 U.S. Dist. LEXIS 117284, at *10-11, 18 (D. Kan. Nov. 3, 2010) (noting that an ALJ is not required to provide a limitation-by-limitation explanation in assessing a claimant's RFC).  Instead, the ALJ was required to provide only enough explanation to allow a subsequent reviewer, reading the decision as a whole and with common sense, to understand the weight he gave these opinions and the reasons for that weight. *See Buckhanon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 678-79 (7th Cir. 2010) (stating that an ALJ is not required to include his explanation "within a single paragraph," and that the court will

---

[2] The court notes that, because the ALJ's RFC was *consistent* with Dr. Kerwin's and Dr. Schwartzman's opinions, any error that might have arisen from the ALJ's failure to specifically express the weight given to that limitation was harmless.  *See Berry v. Comm'r of Soc. Sec.*, No. 20-3039, manuscript op. at 5 (6th Cir. July 30, 2020) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 547 (6th Cir. 2004)).

"read the ALJ's decision as a whole and with common sense."); *see also* SSR 06-3p, 2006 SSR

LEXIS 5.  And the ALJ's decision, read as a whole, was sufficient for Winner and the Court to

understand that: (1) he gave Dr. Kerwin's and Dr. Schwartzman's opinions "partial weight"

because they were partially consistent and partially inconsistent with other evidence in the

record; and (2) he gave Riskin's opinion "little weight" because it was inconsistent with other

evidence in the record, Riskin did not reconcile his opinion with Winner's drug and alcohol use,

and Riskin commented on physical limitations that were outside his scope of practice.  (Tr. 23-

24).  The regulations required nothing more.[3]  *Gayheart*, 710 F.3d at 376; 20 C.F.R.

§ 404.1527(c); SSR 06-3p, 2006 SSR LEXIS 5.

Substantial evidence also supported the ALJ's reasons for discounting Dr. Kerwin's,

Dr. Schwartzman's, and Riskin's opinions.  Here, evidence supported the ALJ's conclusions that

the limitations in Dr. Kerwin's, Dr. Schwartzman's, and Riskin's opinions were inconsistent with

other evidence, including: (1) treatment notes indicating that Winner had good impulse control,

fair judgment, logical thought content, and intact cognition; (2) notes indicating that Winner was

cooperative, was calm, was pleasant, could engage in active conversation, and could travel to and

live in Florida with his friends or on his own; (3) Winner's comments that his medication had

"taken off the edge" or controlled his symptoms; (4) Riskin's findings that Winner was in only

"mild" distress and had appropriate behavior, intact thought, focused concentration, intact

insight/judgment, intact memory; and Dr. Evans's examination findings that Winner was

---

[3] Here, the distinction between the regulations governing an ALJ's assessment of treating physician opinions and the way ALJ's must assess opinions from non-examining sources or non-"acceptable medical sources" is important.  Were the opinions at issue given by treating acceptable medical sources, the "good reasons" rule would have required the ALJ to provide a more in-depth analysis of the regulatory factors supporting the weight he gave those opinions and identify the specific ways in which the limitations in those opinions were inconsistent with evidence.  *See Hargett v. Comm'r of Soc. Sec.*, No. 19-cv-3718, 2020 U.S. App. LEXIS 21171 (6th Cir. July 8, 2020).

cooperative and friendly, had no conversation issues, had no observed anxiety features, had average performance on cognitive tests, and would not have any difficulty understanding and carrying out simple to moderately complex instructions.  (Tr. 220, 236, 252, 296, 298-99, 332, 336, 338, 347, 405-06, 410-12, 416-17, 428, 445, 474, 477-78, 547-49).  Further, the numerous treatment notes indicating that Winner admitted to daily or weekly use of alcohol and marijuana as late as November or December 2016, supported discounting Riskin's opinion on the basis that it failed to consider the effects of Winner's alcohol and marijuana use – even if he had stopped using marijuana in December 2016.  (Tr. 329-30, 344, 403-04, 409-10).  And, although Riskin's opinions generally focused on Winner's mental functions, Riskin's limited scope of practice – providing mental health counseling – supported the ALJ's decision to discount any physical limitations in his opinion, such as Riskin's statements regarding whether Winner would need to elevate his leg or use assistive devices when walking.[4]  (Tr. 534-35).  And, even if court might have concluded if reviewing the record *de novo* that evidence in the record could have supported giving Dr. Kerwin's, Dr. Schwartzman's, and Riskin's opinions greater weight, this court must nevertheless affirm the ALJ's weight decisions because the ALJ's reasons for discounting those opinions were reasonably drawn from the record.  42 U.S.C. § 405(g); *Rogers*, 48 F.3d at 241; *Biestek*, 880 F.3d 783; *Mullen*, 800 F.2d at 545.

### 2.        Limitations Omitted from the Mental RFC Finding

The ALJ also applied proper legal standards and reached a decision supported by substantial evidence deciding to limit Winner to only "occasional interaction with a small group of coworkers where the contact is casual in nature," declining to limit Winner to only superficial interaction with supervisors, declining to include a "constructive criticism" limitation, and

---

[4] Winner strenuously contended that Riskin expressed nothing but mental health opinions.  The records cited here indicate otherwise.

declining to adopt Dr. Schwartzman's limitation that Winner be given a flexible schedule during symptom flare-ups.  Here, the ALJ complied with the regulations by expressly considering all of the evidence and all of Winner's symptoms in evaluating his mental RFC; and he discussed Winner's hearing testimony (including testimony that he had periodic panic attacks during which he called off work and became "loud and uncontrollable), exhaustively reviewing the medical records, and addressing and weighing each of the medical opinions. (Tr. 20-24); 20 C.F.R. §§ 404.1520(e), 404.1529(a); SSR 96-8p, 1996 SSR LEXIS 5.  Further, because the ALJ gave only "partial weight" to Dr. Kerwin's and Dr. Schwartzman's opinions and "little weight" to Riskin's opinion, the ALJ was not required to adopt any, much less all, of the limitations from those opinions.  *See Rogers v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 276 (6th Cir. 2015) (holding that an ALJ was not required to incorporate into the RFC every limitation from a consulting physician's opinion, even when the ALJ gave that opinion "great weight").

Substantial evidence also supported the ALJ's decision not to incorporate into his ultimate RFC finding greater restrictions in Winner's ability to coordinate with coworkers and supervisors or a limitation requiring supervisors to give Winner constructive criticism.  First, evidence in the record showed that Winner's ability to coordinate with coworkers and supervisors in the workplace was limited only to occasional interaction, rather than superficial interaction, including: (1) Dr. Kerwin's and Dr. Schwartzman's opinions indicating that Winner was only "moderately" limited in this area and was precluded only from "frequent coordination with others"; (2) treatment notes indicating that Winner had good impulse control, was cooperative, was calm, was pleasant, could engage in active conversation, could live in Florida with his friends, had a girlfriend in 2016, and was able to maintain his relationships with his children by seeing them once or twice a month and living with his son; (3) Winner's statements

that he felt like medication had "taken off the edge" by December 2016 and controlled his symptoms by January 2018; and (4) Dr. Evans's examination findings that Winner was cooperative and friendly, had no conversation issues, and had no observed anxiety features.  (Tr. 74, 76-77, 90-91, 220, 236, 252, 296, 298-99, 332, 336, 338, 347, 405-06, 410-12, 416-17, 428, 445, 547-48).  And, even if this court would have concluded on *de novo* review that Winner had greater social/coordination restrictions than those incorporated into the RFC, the ALJ's ultimate decision not to include greater restrictions in this area fell within the Commissioner's "zone of choice" because it was reasonably drawn from the record.  *Mullen*, 800 F.2d at 545.

Second, substantial evidence supported the ALJ's decision not to include a "constructive criticism" limitation in the RFC.  Here, it is important to note that Winner appears to have misconstrued Dr. Schwartzman's comment – that "[s]upervisors will need to offer constructive criticism"  – to mean that Winner would need to receive constructive feedback or redirection on an ongoing basis after his training period.  (Tr. 64-65); ECF Doc. 15 at 12, 16.  Considering that Dr. Schwartzman had also limited Winner to only "brief and superficial" interaction with supervisors and independent work "without close over-the-shoulder supervision," a more accurate interpretation would be: "if any supervisor criticism was needed, it should be given in a constructive manner and not from a position of conflict."  (Tr. 91).  And the ALJ appears to have formulated the RFC to avoid the need for constructive criticism and avoid any greater than superficial interaction with supervisors by limiting Winner to simple tasks in a static environment with infrequent and gradually implemented changes, even though evidence showed that he had no cognitive difficulties, was not easily distracted, and could be capable of performing up to moderately complex tasks.  (Tr. 20, 220, 236, 252, 338-39, 347, 405-06, 411-12, 445, 460, 477-78, 545, 548).  Even if Dr. Schwartzman had meant that Winner needed

ongoing feedback and redirection, substantial evidence would have supported omitting that limitation because: (1) the ALJ found that Dr. Schwartzman's opinion was due only "partial weight"; (2) a requirement that Winner be given ongoing constructive criticism would be internally inconsistent with Dr. Schwartzman's statements that Winner could only have superficial interaction with supervisors and needed to work without close over-the-shoulder supervision; and (3) the limitation would be inconsistent with treatment notes indicating that Winner had no cognitive impairments, was not easily distracted, and was cognitively able to perform up to moderately complex tasks.  (Tr. 91, 220, 236, 252, 338-39, 347, 405-06, 411-12, 445, 460, 477-78, 545, 548).  Thus, the ALJ's decision not to incorporate a "constructive criticism" limitation into the RFC was also reasonably drawn from the record and fell within the Commissioner's "zone of choice."  *Mullen*, 800 F.2d at 545.

Third, substantial evidence also supported the ALJ's decision not to incorporate a limitation that Winner be given a flexible schedule during symptom flare-ups.  Such evidence includes: (1) the lack of such a limitation in any other mental function opinion; (2) treatment and examination notes consistently finding that Winner had no cognitive impairments, was not easily distracted, was cognitively able to perform up to moderately complex tasks, had good impulse control, was cooperative, was calm, was pleasant, could engage in active conversation, and could travel to or live in Florida alone and with his friends; (4) Dr. Evans's examination findings that Winner was cooperative and friendly, had no conversation issues, and had no observed anxiety features; and (5) Winner's December 2016 and January 2018 comments that his medications appeared to reduce or control his symptoms.[5]  (Tr. 74, 76-77, 220, 236, 252, 296, 298-99, 332, 336, 338-39, 347, 405-06, 410-12, 416-17, 428, 445, 474, 477-78, 533-38, 547-49).  And, again,

_____

[5] Significantly, Winner's statements that his medications had begun to reduce or control his symptoms came *after* he purportedly quit using marijuana on a daily or weekly basis.

even though other evidence in the record could have supported the inclusion of a flexible schedule and pace limitation in Winner's RFC, the decision not to include that limitation fell within the Commissioner's "zone of choice" because other evidence supported its exclusion. *Mullen*, 800 F.2d at 545.

Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence in declining to incorporate in the RFC greater mental function limitations, the ALJ's mental RFC findings must be affirmed.  *Jones*, 336 F.3d 476; *Rogers*, 486 F.3d at 241; *Biestek*, 880 F.3d at 783.

### C.    Physical RFC

Winner next argues that the ALJ failed to apply proper legal standards and reach a decision supported by substantial evidence in determining that he was capable of performing a limited range of medium work.  ECF Doc. 15 at 22-25.  Winner asserts that substantial evidence did not support the conclusion that he could lift up to 50 pounds occasionally and 25 pounds frequently – the distinguishing features between medium and light work.  ECF Doc. 15 at 23-25. Instead, Winner asserts that all the evidence in the record showed that he could perform the lifting requirements of light work at most, and no evidence supported the conclusion that he could lift up to 50 pounds occasionally.  ECF Doc. 15 at 22-25.  Further, Winner argues that the ALJ's error in finding that he was able to perform medium work was not harmless because, if he were capable of performing only light work the medical-vocational guidelines would have directed a finding that he was disabled.  ECF Doc. 15 at 23-24.  Thus, Winner contends that the ALJ's failure to find that he was limited to light work at Step Four resulted in an improper determination that he was not disabled at Step Five, where the Commissioner has the burden of proof.  ECF Doc. 15 at 23.

The Commissioner responds that the ALJ applied proper legal standards and reached a decision supported by substantial evidence in finding that Winner was able to perform medium work.  ECF Doc. 17 at 6-10.  The Commissioner argues that Winner had the burden to produce evidence regarding his limitations at Step Four but did not produce evidence showing that he was incapable of performing the requirements of medium work.  ECF Doc. 17 at 7.  Instead, the Commissioner asserts that evidence in the record supported the conclusion that Winner was able to perform the lifting/carrying requirements of medium work because: (1) he had performed medium work in the past; and (2) objective medical evidence showed that he retained full strength both before and after his corrective surgery.  ECF Doc. 17 at 6-7.  Further, the Commissioner contends that the only evidence Winner relied upon to show he had more limited lift/carry function was his own subjective complaints (which the ALJ properly discounted as inconsistent with the medical evidence), a psychology note from 2017, and a surgeon note setting out post-operative restrictions in place for only six weeks.  ECF Doc. 17 at 7-9.

As discussed above, the ALJ must determine a claimant's RFC by considering all relevant medical and other evidence.  20 C.F.R. §§ 404.1520(e), 416.920(e).  And the RFC is an assessment of a claimant's ability to do work despite his impairments.  *Walton v. Astrue*, 773 F. Supp. 2d 742, 747 (N.D. Ohio 2011) (citing 20 C.F.R. § 404.1545(a)(1) and SSR 96-8p, 1996 SSR LEXIS 5 (July 2, 1996)).  Further, when an ALJ finds that a claimant is capable of medium work, that finding by definition means that the claimant can "lift[] no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds."  20 C.F.R. § 404.1567(c).

The ALJ applied proper legal standards and reached a decision supported by substantial evidence in evaluating Winner's physical RFC.  42 U.S.C. § 405(g).  As the court found with

regard to the ALJ's mental RFC assessment, the ALJ complied with the regulations in assessing

Winner's physical RFC by expressly stating that he considered all the evidence and all of

Winner's alleged symptoms.  (Tr. 20).  Such evidence included: (1) Winner's testimony that he

dropped items due to weakness and numbness in his hands; (2) notes indicating that Winner

underwent two spinal fusion surgeries in 1995; (3) Winner's reports of increasing neck and arm

pain, weakness, and numbness in 2017 and 2018; (4) notes indicating that Winner underwent

another spinal fusion surgery in 2018, after which he had good pain control and could mobilize

easily; and (5) Dr. Cacchillo's and Dr. Gallagher's opinions that Winner had no physical

impairments.  (Tr. 20-22).  Further, the ALJ explained that he gave "little weight" to

Dr. Cacchillo's and Dr. Gallagher's opinions and found Winner's subjective complaints

inconsistent with other evidence in the record – both findings that Winner has not challenged.

(Tr. 21-22); ECF Doc. 15.  Notably, none of the evidence in the record evaluated whether

Winner could lift up to 50 pounds occasionally or 25 pounds frequently – and Winner had the

burden to produce such evidence at the RFC stage.  20 C.F.R. § 404.1512(a); *Warner v. Comm'r*

*of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).  Nevertheless, substantial evidence supported the

ALJ's conclusion that he could perform medium work, including: (1) Winner's history of

performing medium work, even after having had two spinal fusion surgeries in 1995; and

(2) treatment notes indicating that Winner had 5/5 strength, symmetric reflexes, no pain on range

of motion, 5/5 active range of motion, no numbness or tingling in his extremities, and an

independent or normal gait; (3) physical therapy notes indicating that Winner's posture

strengthening progressed and he was able to complete modified exercises without difficulty;

(4) Winner's statements to treatment providers rating his pain and other physical symptoms at

1 to 3 on a 10-point scale; and (5) discharge notes indicating that Winner had good pain control

35

and ability to mobilize after surgery, despite the surgeon's recommendation that he limit his activity for 6 weeks during recovery.  (Tr. 483, 490, 493, 500, 509, 514, 521, 573, 576-77).  Thus, the ALJ's finding that Winner retained the RFC for a reduced range of medium work was reasonably drawn from the record and fell within the Commissioner's "zone of choice."  *Mullen*, 800 F.2d at 545.

Accordingly, because the ALJ applied proper legal standards and reached a conclusion supported by substantial evidence in evaluating Winner's physical RFC, this court must affirm.  *Jones*, 336 F.3d 476; *Rogers*, 486 F.3d at 241; *Biestek*, 880 F.3d at 783.

**VI.  Conclusion**

Because the Administrative Law Judge applied proper legal standards and reached a decision supported by substantial evidence, the Commissioner's final decision denying Winner's application for DIB is AFFIRMED.

**IT IS SO ORDERED.**

Dated: August 13, 2020

Thomas M. Parker
United States Magistrate Judge